Filed 4/18/14  P. v. Laulu CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B245988 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA069639) |
| v. | |
| JULIUS LAULU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Steven R. Van Sicklen, Judge.  Affirmed, in part as modified, reversed, in part, and remanded with directions.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendant and appellant Julius Laulu (defendant) guilty of, inter alia, two counts of first degree murder, and the trial court sentenced him on those counts to two consecutive terms of life without the possibility of parole.  On appeal, defendant does not challenge any aspect of his two murder convictions or the sentences imposed thereon.  Instead, he raises several issues as to other counts on which he was found guilty, including challenges to the sufficiency of the evidence in support of the guilty verdicts on the witness dissuasion and unlawful taking of a vehicle charges; a jury instruction on witness dissuasion; the trial court's response to a jury question related to possession of a firearm; and four challenges to his determinate sentence.

We hold as follows:  the trial court's oral pronouncement of sentence on counts 19 and 20 for unlawful taking of a vehicle is reversed and the matter remanded for an oral pronouncement of sentence on those counts that conforms with the jury's verdict; the sentences on counts 4, 5, and 7 are hereby modified to reflect one-third the middle term sentence enhancements on counts 4 and 5 under Penal Code section 12022.53, subdivision (b)[1] and to reflect a full middle term sentence enhancement on count 7 under section 12022.5, subdivision (a); the award of presentence custody credit is reversed, and the matter is remanded to the trial court to resolve the issue of the correct amount of additional presentence custody credit to which defendant is entitled.  In all other respects, the trial court's judgment of conviction is affirmed.

## FACTUAL BACKGROUND

R.D. testified that in September 2007, she was employed by Joel's Insurance Agency, which was owned by victim Joel Perez and located at 415 Manchester Boulevard in Inglewood.  She performed billing, accounting, and customer service duties.  The office suite in which the agency was located was on the second floor of the building.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

Victim Lorena Rodriguez had an office in the same suite as the insurance agency, from which office she operated a real estate business.

On September 26, 2007, R.D. arrived at work around 10:00 a.m. Rodriguez and Perez were already at the office suite when she arrived. A short time later, Perez left to meet a client.

Three or four hours later, defendant, codefendant Osman Canales, and Juan Maldonado entered the office suite, and Canales asked for Rodriguez. When Rodriguez came out of her office, she greeted Canales with "a hug and a kiss." Canales and Rodriguez went into Rodriguez's office, while defendant and Maldonado waited in the lobby area with R.D. About five minutes later, Canales and Rodriguez came out of her office, at which point defendant rushed toward R.D., put a gun to her head, and said, "This is a robbery" and "This is not a joke." Neither Canales nor Maldonado had a gun. Canales tied R.D.'s hands in front of her with a white trash bag. He also tied Rodriguez's hands, and then he and defendant took her into her office.

Rodriguez came out of her office and gave R.D. her credit card and driver's license.[2] Canales and defendant instructed R.D. to make a telephone call and order 15 television sets. The person to whom R.D. spoke on the call asked her for a photocopy of Rodriguez's driver's license and credit card. R.D. made the photocopy and attempted to fax it as requested, but the fax "did not go through."

When R.D. failed to complete the telephonic purchase transaction, Canales and defendant became angry. They told Maldonado to drive Rodriguez to her bank and withdraw her money. Before Maldonado and Rodriguez left for the bank, defendant and Canales told Rodriguez that if she did not comply with their instructions, they would kill R.D. R.D. then saw Maldonado leave with Rodriguez.

Defendant took R.D.'s purse and removed her money, a copy of her check, and her checkbook, which had her name and address in it. Canales and defendant told R.D. that if she "reported anything," they would kill her.

---

**2** It was not clear if her hands remained tied.

After Maldonado and Rodriguez left, Canales "picked [R.D.] up aggressively—and threw [her] in front of the red sofa while her hands were tied." Canales began to touch R.D. "all over," including her breasts, buttocks, and "pubic area." R.D. told Canales to stop, but he refused until she told him she was sick. At that point, Canales stopped touching R.D.

When Maldonado and Rodriguez returned from the bank, Canales and defendant tied Rodriguez up and took her into her office. After 15 minutes, Canales and defendant came out of Rodriguez's office. R.D. noticed that Canales had "a lot" of blood on his hands. [3] Defendant also had blood on his hands. R.D. watched as defendant and Canales cleaned their hands. They also cleaned everything they touched in the office suite.

R.D. next heard Perez at the door to the office suite and saw him enter. Maldonado pushed Perez, and Canales and defendant grabbed him and threw him to the floor. All three men hit and kicked Perez. They then lifted him up and tied his hands. Defendant attempted to cut Perez's throat with a knife, but when he "couldn't completely–finish," "Canales took over." The three men then "grabbed [Perez] and threw him in [his] office." At that point, Maldonado lifted R.D.'s shirt and covered her face so she "couldn't see the rest."

R.D. was in shock, crying, and praying. Canales and Maldonado then came toward R.D., grabbed her, and threw her next to Perez's body. She asked Maldonado not to kill her because she had children. She also told Canales and defendant that she did not want to die, but defendant said he did not care if she had children and that they would "kill [her] regardless." The three men could not agree on whom should kill R.D. Maldonado then told the other two not to kill her because she had children, but "[t]hey didn't care."

Canales, who apparently changed his mind about killing R.D., untied R.D.'s hands. He and defendant told R.D. that "if [she] were to report the crime, if [she] were to report or say anything, . . . [she] would be killed, and [her] family would be killed as

---

**3**    As stated below, Canales had killed Rodriguez by slitting her throat.

4

well." R.D. "grabbed" her purse while Canales and defendant continued to threaten her, stating, "'you're going to be—we are letting you go, but if you report this to anybody, then you're going to be killed. You and your family are going to be killed. We have your information. We know where you live, and you're going to be killed." Defendant also told R.D. that if the police found out what happened at the office and contacted R.D., she should tell the police that the men who committed the crimes were African Americans.

R.D. went downstairs with the three men. Canales entered Perez's BMW, and defendant and Maldonado entered Rodriguez's car. R.D. watched as the men drove away. She was afraid they would come back and kill her. R.D. left the parking lot, proceeded to Manchester Boulevard, and walked to a 7-Eleven on the corner. She saw school police officers in the 7-Eleven parking lot and asked them for help. Those officers told her to call the Inglewood Police Department. The manager of the 7-Eleven allowed R.D. to use her phone to call the police. Police officers responded and interviewed R.D. R.D. told them that three African-American men had committed a crime at her office. She followed the instructions given to her by defendant and Canales concerning the misidentification of the perpetrators because she was scared.

In the days following the incident, R.D. "moved about" several times because of the threats to her life and her children's lives. R.D. initially told her boyfriend, and then again told the police during a subsequent interview, that the men who committed the crimes were African American. Ultimately, however, R.D. told the police the truth about the incident.

Maldonado testified that in September 2007, he, then 16-years-old and the stepson of Canales, had a conversation with defendant and Canales at Maldonado's home. Canales told them of his plan to rob Rodriguez who owed Canales money.[4] He explained that the three of them would walk from Maldonado's house to Rodriguez's office, which

---

[4] Maldonado subsequently clarified that Canales's original plan was to rob Perez, not Rodriguez.

was "a couple of blocks away." Maldonado initially told Canales "'I'm not gonna do it.'" In response, Canales became angry and threatened to rape and kill Maldonado's mother and sister if Maldonado did not participate in the robbery. Based on that threat, Maldonado agreed to participate in the robbery.

Defendant and Maldonado walked toward Rodriguez's office on one side of the street, while Canales walked on the other side. But when the three men arrived at Rodriguez's office, Perez's car was not there, so they left.

On September 26, 2007, Maldonado and Canales had another conversation. Canales came to Maldonado's room and said that they were going to rob Rodriguez.[5] When Maldonado refused to participate, Canales again threatened to rape and kill Maldonado's mother and sister. Based on the renewed threat, Maldonado agreed to participate in the robbery. Canales then reiterated to Maldonado and defendant his plan to commit the robbery. During the conversation, Maldonado observed a handgun in Canales's waistband.

The three men again walked to Rodriguez's office, with defendant and Maldonado walking on one side of the street and Canales on the other side. When they reached the parking lot of the office, Canales noticed that Perez's car was not there, but Rodriguez's car was there. Canales decided to rob Rodriguez instead of Perez. He instructed Maldonado to act as a lookout on Manchester, and he and defendant went to the second floor office suite which had a lobby area, two small offices, and a bathroom. Canales later came down to Manchester and told Maldonado to join him in the office suite. As Maldonado entered the lobby area of the suite, he saw R.D. sitting at her desk with defendant standing next to her. Rodriguez came out of her office and defendant "pulled out the gun and told [R.D.] that this is a robbery." R.D. responded by saying "Don't play." Defendant replied, "'[I]t's not a joke.'" Canales instructed Maldonado to tie up the two women with trash bags. Canales searched Rodriguez's office and her purse, and then asked her if she had any money in the bank. When Rodriguez replied that she had

---

[5]    See footnote 3, ante.

6

money in the bank, Canales told Maldonado to take her to the bank and ensure that she withdrew the money. Maldonado told Canales that he did not want to go to the bank because it had security cameras. Canales reminded Maldonado what would happen to his mother and sister if he refused to comply with Canales's directions.

Maldonado drove Rodriguez to her bank in her car.[6] They parked in the bank's parking lot and went inside. While they were waiting in line, Canales called Maldonado on Rodriguez's telephone to ask if "everything was alright." Rodriguez withdrew all the money in her account, except $500 that Maldonado allowed her to retain. Rodriguez gave Maldonado all of the money she withdrew, and the two drove back to her office. Inside her office, Maldonado saw Canales and defendant next to R.D., who was seated at her desk. Canales asked Maldonado for the money Rodriguez withdrew from her bank, which money Maldonado gave to him.

Canales then took Rodriguez into her office and closed the door while defendant and Maldonado remained in the lobby area with R.D. Maldonado heard a scream, went into Rodriguez's office, and saw her on her stomach with her arms at her sides and her "head up." Canales was next to her cutting her throat in "a sawing motion."[7] Maldonado asked Canales what he was doing because he could not "believe what was going on."

Maldonado walked out of Rodriguez's office and started walking toward the door to leave. At that point, he heard someone trying to open the door from the outside. Maldonado looked through the peephole in the door and told Canales, "'There's a guy right there.'" Canales responded, "Bring him in. That's who we're supposed to be here for. . . . That's the main dude." Perez opened the door from the outside with his keys, entered, saw R.D., and said something to her in Spanish that Maldonado did not

---

[6] During the incident, Maldonado recalled seeing R.D. on the telephone and hearing her "ordering stuff with credit cards," but he could not recall whether that was before or after he went to the bank.

[7] The coroner who performed the autopsy on Rodriguez testified that the slice wound to Rodriguez's neck "nearly cut her head off. Her head was attached just by the backbone."

understand. Maldonado "jumped from behind the door and grabbed [Perez]." When Perez tried to push him, Maldonado pulled him into the lobby area and began fighting with him. Defendant then "jumped in, and [they] starting jumping [Perez]." They were both "socking" Perez, causing him to fall to the floor where they began kicking him. When Perez stopped fighting back, Canales pulled him into Perez's office. Canales "started cutting [Perez's] throat right away." Canales "was just going up and down like a sawing motion." Canales used "a big, long" kitchen knife. Canales stated that "they owed him money. That [was] why he was doing what he did, because . . . they had to pay for what they did."[8]

After he cut Perez's throat, Canales pulled R.D. into Perez's office and threw her to the floor next to Perez's body. R.D. was crying and asking them not to kill her because she had children. Canales wanted to kill R.D., but Maldonado grabbed her, "put her behind [him]," and told Canales they were not going to kill her. Canales disagreed, stating, "'No, she [has] seen the faces, she [has] seen everything. She [is] going to snitch.'" Maldonado assured Canales that R.D. was "'not going to snitch,'" and implored him to "'just leave her alone.'" R.D. was crying and telling them that she had children, asking them not to kill her, and confirming that she was not going to say anything. When Canales finally agreed not to kill R.D., the three men told her a "story" to tell the police," i.e., that African Americans committed the crimes.

After someone untied R.D., she walked downstairs with Canales and helped him start Perez's BMW which Canales used to drive away from the scene. Defendant and Maldonado drove Rodriguez's car to a park where Canales had told them to take it. Defendant and Maldonado left Rodriguez's car at the park and walked to Maldonado's house where Canales was waiting for them. Canales and Maldonado took off their clothes, put them into the trash, and changed into other clothes.

When Canales and Maldonado were unable to start Perez's BMW, which was parked in front of Maldonado's house, Canales called his brother who came and started

---

**8**     Maldonado also heard defendant say Perez "This is what you get. This is what you pay for."

the car.  Canales drove the BMW to another park, and his brother and Maldonado followed in the brother's car.  Canales's brother and Maldonado then drove Canales back to Maldonado's house where Canales gave defendant a portion of the money from Rodriguez's bank account and defendant gave Maldonado his portion.

## PROCEDURAL BACKGROUND

In an amended information, the Los Angeles County District Attorney charged defendant in count 1 with the murder of Perez in violation of section 187, subdivision (a); in count 2 with the murder of Rodriguez in violation of section 187, subdivision (a); in count 3 with the second degree robbery of Perez in violation of section 211; in count 4 with the second degree robbery of Rodriguez in violation of section 211; in count 5 with the second degree robbery of R.D. in violation of section 211; in count 6 with the kidnapping of Rodriguez to commit robbery in violation of section 209, subdivision (b)(1); in count 7 with dissuading a witness, R.D., by force or threat in violation of section 136.1, subdivision (c)(1); in count 9 with the second degree commercial burglary of Perez's insurance agency in violation of section 459; in count 18 with the kidnapping of R.D. in violation of section 207, subdivision (a); in count 19 with grand theft auto, Rodriguez's vehicle, in violation of section 487, subdivision (d)(1); and in count 20 with grand theft auto, Perez's vehicle, in violation of section 487, subdivision (d)(1).

The District Attorney alleged as to counts 1 and 2 that the murder of Perez was committed while defendant was engaged in a robbery within the meaning of section 190.2, subdivision (a)(17) and engaged in a burglary within the meaning of section 190.2, subdivision (a)(17); and involved multiple victims within the meaning of section 190.2, subdivision (a)(3).  The District Attorney further alleged as to count 2 that the murder of Rodriguez was committed while defendant was engaged in a kidnapping in violation of section 190.2, subdivision (a)(17).  The District Attorney also alleged as to counts 1, 2, 3, 4, 5, 6, and 18, that defendant personally used a firearm within the meaning of section 12022.53, subdivision (b).  In addition, as to counts 1, 2, 3, 4, 5, 6, 7, 9, 18, 19, and 20, the District Attorney alleged that a principal was armed with a firearm

9

within the meaning of section 12022, subdivision (a)(1). And, as to counts 7, 9, 19, and 20, the District Attorney alleged that in the commission of those offenses, defendant personally used a gun within the meaning of section 12022.5, subdivision (a).

Following trial, the trial court declared a mistrial on count 18, the kidnapping of R.D., because the jury was unable to reach a verdict. On counts 19 and 20, the jury found defendant not guilty on the grand theft auto counts, but found him guilty of the lesser included offenses of unlawful driving of a vehicle in violation of Vehicle Code section 10851, subdivision (a). On all other counts, the jury found defendant guilty as charged and found the special circumstance and gun allegations true.

The trial court sentenced defendant on counts 1 and 2 to consecutive life without the possibility of parole sentences based on the true findings on special circumstances allegations, plus additional, consecutive 10-year sentences on each count based on the true findings on gun use allegations. On count 6, the kidnapping of Rodriguez for robbery, the trial court imposed a consecutive life sentence, plus an additional 10-year sentence based on the gun use allegation. On count 3, the second degree robbery of Perez, the trial court imposed a consecutive upper term sentence of five years, plus an additional sentence of 10 years based on the gun use allegation. On counts 4 and 5, the second degree robberies of Rodriguez and R.D., the trial court imposed consecutive 11-year sentences as to each count comprised of one-third the middle term one-year sentences, plus additional, consecutive 10-year sentences based on the gun use allegations as to each count. On count 7, the witness dissuasion of R.D. by threat or force, the trial court imposed a consecutive four-year, four-month sentence comprised of a three-year term, plus an additional one-third the middle term sentence enhancement of 16 months based on the gun use enhancement. On count 9, the burglary of the insurance agency, the trial court imposed, but stayed pursuant to section 654, a consecutive two-year term, comprised of a one-third the middle term sentence of eight months, plus an additional one-third the middle term sentence of 16 months pursuant to the gun use allegation. On counts 19 and 20, the unlawful driving or taking of Perez's and Rodriguez's vehicles, the trial court imposed consecutive two-year sentences comprised

10

of one-third the middle term sentences of eight months as to each count, plus additional one-third the middle term sentences of 16-months as to each count based on the gun allegations; but the trial court stayed the sentence as to count 20 pursuant to section 654. The trial court sentenced defendant to an aggregate determinate term of 73 years and four months, plus the two consecutive life without the possibility of parole sentences on counts 1 and 2 and the consecutive life sentence on count 6.

## DISCUSSION

### A. Dissuasion by Force or Threat

#### 1. Standard of Review

Defendant's challenge to the sufficiency of the evidence in support of the witness dissuasion count is reviewed under a substantial evidence standard. "'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . . "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]' ([*People v*.] *Guerra* [(2006)] 37 Cal.4th [1067,] 1129; see *People v. Lindberg* [(2008)] 45 Cal.4th [1,] 27.)" (*People v. Scott* (2011) 52 Cal.4th 452, 487.)

*2. Analysis*

Defendant contends that there was insufficient evidence to support his conviction on count 7, dissuading a witness, R.D., by force or threat in violation of section 136.1, subdivision (c). Defendant concedes in his reply brief that R.D. repeatedly testified that defendant and Canales told her that they would kill her and her family if she reported the crimes to anyone, including the police. Defendant asserts, however, that the record establishes that R.D.'s testimony in that regard was false, and that Canales and defendant actually told her to lie to the police—conduct that does not violate section 136.1, subdivision (c)—as opposed to telling her not to speak to the police.

Defendant was charged in count 7 with dissuading a witness in violation of section 136.1, subdivision (c), which violation was based on defendant's commission of acts prohibited by subdivision (b). Subdivision (b) of section 136.1 applies to acts of dissuasion taken against victims of and witnesses to crimes. It provides as follows: "Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: [¶] (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge. [¶] (2) Causing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof. [¶] (3) Arresting or causing or seeking the arrest of any person in connection with that victimization." (§ 136.1, subd. (b).)

Defendant's contention concerning the credibility of R.D.'s testimony is meritless. Under the governing standard of review, we do not reweigh the evidence or reevaluate a witness's credibility. Here, R.D. testified specifically that defendant and Canales threatened to kill her if she reported their crimes to the police, testimony that the jury presumably believed and upon which it found defendant guilty on count 7. Although R.D. also testified that defendant and Canales instructed her to lie about the ethnicity of

12

defendant and his cohorts *if questioned by the police*, that testimony was not inconsistent with her other testimony detailing the threats that were intended to deter her from voluntarily contacting police about the crimes in the first instance. When that other testimony is viewed in a light most favorable to the guilty verdict on count 7, it constituted substantial evidence in support of the verdict, i.e., evidence that was reasonable, credible, and of solid value.

### B.    Jury Instruction on Dissuasion by Force or Threat

Defendant contends that the trial court's jury instruction on the elements of section 136.1, subdivision (c) was inadequate. According to defendant, to find the allegations under subdivision (c) true, the jury was required to find, inter alia, that defendant, in dissuading R.D., acted in furtherance of a conspiracy to intimidate a witness or used or threatened to use force, but the trial court failed to instruct the jury adequately as to either of those elements.

#### 1.    *Background*

The jury found defendant guilty on count 7, dissuading a witness, R.D., by threat or force in violation of section 136.1, subdivision (c). Under subdivision (c),[9] if a defendant who has been found to have committed an act of witness dissuasion, as

---

[9]    Section 136.1, subdivision (c) provides: "c)  Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances:  [¶]  (1) Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person.  [¶]  (2) Where the act is in furtherance of a conspiracy.  (3) Where the act is committed by any person who has been convicted of any violation of this section, any predecessor law hereto or any federal statute or statute of any other state which, if the act prosecuted was committed in this state, would be a violation of this section.  (4)  Where the act is committed by any person for pecuniary gain or for any other consideration acting upon the request of any other person.  All parties to such a transaction are guilty of a felony."

described in subdivision (b), did so knowingly and maliciously and, inter alia, in furtherance of a conspiracy to dissuade a witness or with force or the threat of force, he or she is punished by a prison term of two, three, or four years, instead of the one-year county jail term or the 16 month, two, or three year[10] prison term imposed for a violation of subdivision (b).

On the charge of dissuasion of a witness by threat or force, the trial court first instructed the jury with CALCRIM No. 2622,[11] which defined the basic elements of the crime of witness dissuasion under subdivision (b). Because defendant was charged under subdivision (c) of section 136.1—which, as noted, provided for longer prison terms than subdivision (b) if certain additional elements or circumstances were proved—the trial court also instructed the jury with CALCRIM No. 2623. The modified version of that form instruction given by the trial court provided as follows: "If you find the defendant guilty of intimidating a witness, you must then decide whether the People have proved the additional allegations that the defendant acted maliciously and acted in furtherance of a conspiracy or used or threatened to use force. [¶] To prove these allegations, the People must prove that: [¶] 1. The defendant acted maliciously. [¶] A person acts maliciously when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the

---

**10** Section 18, subdivision (a) provides that when an offense, such as a violation of section 136.1, subdivision (b), is declared to be a felony and no different punishment is prescribed by law, that felony is punishable by imprisonment for "16 months, or two or three years."

**11** The version of CALCRIM No. 2622 given to the jury provided as follows: "The defendant maliciously tried to prevent or discourage/prevented or discouraged [R.D.] from making a report that she was a victim of a crime to the police; [¶] 2. [R.D.] was a witness and crime victim; AND [¶] 3. The defendant knew he was preventing or discouraging [R.D. from making a report that she was a victim of a crime to the police and intended to do so."

14

People have not met this burden for any allegation, you must find that the allegation has not been proved."

Defendant maintains that the version of CALCRIM No. 2623 given by the trial court was inadequate in two respects. First, although the first sentence of the instruction refers generally to the conspiracy element set forth in section 136.1, subdivision (c)(2), defendant argues that the instruction failed to include the language from the form instruction that specified that the object of the conspiracy must be witness dissuasion.[12] Second, although the first sentence of the trial court's instruction referred to the force or threat of force element set forth in section 136.1, subdivision (c)(1), the instruction did not contain the language from the form instruction that further described that element.[13] According to defendant, because the foregoing omissions from the trial court's instruction would have defined necessary elements of the crime charged under section 136.1, subdivision (c), the instruction failed to advise the jury adequately of certain required elements of the charged crime.

Contrary to defendant's assertion, the challenged instruction did not omit or misstate the elements of the crime, or sentencing factor,[14] charged or alleged in count 7 under section 136.1, subdivision (c). As to the conspiracy element of section 136.1, subdivision (c)(2), the first sentence of the instruction mirrored the language of that

---

[12]   CALCRIM No. 2623 contained an "Alternative A" that described the conspiracy element as follows: "To prove (this/these) allegation[s], the People must prove that: *<Alternative A—furtherance of a conspiracy>* [(2A/1). The defendant acted with the intent to assist in a conspiracy to intimidate a witness(;/.)]"

[13]   CALCRIM No. 2623 also contained an "Alternative B" that described the force or threat of force element as follows: "To prove (this/these) allegation[s], the People must prove that: "*<Alternative B—used or threatened force>* [(2B/2). The defendant used force or threatened, either directly or indirectly, to use force or violence on the person or property of [a] (witness[,]/ [or] victim[,]/ [or] any other person)(;/.)]"

[14]   The bench notes for CALCRIM No. 2623 describe section 136.1, subdivision (c) as a "sentencing factor" that relates to the offenses described in subdivisions (a) and (b), as opposed to a separate offense. The amended information, however, charged defendant in a separate count with a violation of section 136.1, subdivision (c).

15

subdivision. Moreover, the amended information under which defendant was charged did not allege that defendant's acts of witness dissuasion were undertaken as part of a conspiracy; it alleged only that defendant's acts of witness dissuasion were committed with force or the threat of force. Thus, there was no need to provide a further or more precise definition of an element that was not in issue. As to the threat of force element set forth in section 136.1, subdivision (c)(1), the language in the first sentence of the instruction not only mirrored the language of that subsection, it also was substantially similar to the omitted language from the form instruction further describing that element. Therefore, the instruction stated the threat of force element accurately, albeit generally, such that the trial court had no sua sponte duty to revise or clarify it absent a request from defendant's trial counsel. "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel (*People v. Kelly* (1992) 1 Cal.4th 495, 535 [3 Cal.Rptr.2d 677, 822 P.2d 385]), and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal (*People v. Rundle* (2008) 43 Cal.4th 76, 151 [74 Cal.Rptr.3d 454, 180 P.3d 224]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [91 Cal.Rptr.3d 874])." (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

Defendant's trial counsel did not ask the trial court to specify that the conspiracy element of section 136.1, subdivision (c) had not been alleged in the amended information and was therefore not relevant to the jury's determination on count 7, or, in the alternative, ask the court to clarify that the conspiracy element required proof of a conspiracy to dissuade a witness. Defendant therefore forfeited his challenge to the adequacy of the instruction on that basis. Similarly, because defendant's trial counsel failed to request that the trial court clarify or amplify the instruction's language on the force or threat of force element, defendant forfeited that claim of instructional error as well.

## C.     Unlawful Taking of a Vehicle

Defendant contends that there was insufficient evidence to support his convictions on counts 19 and 20, the unlawful taking of the murder victims' vehicles in violation of Vehicle Code section 10851, subdivision (a).  According to defendant, because the victims were dead at the time their vehicles were taken, he could not have deprived the victims of their vehicles, as required by that statute, because title and right to possession of those vehicles had passed to the victims' respective estates.  As defendant reads the statute, it requires a taking of title or possession from a natural person, not an estate.

Defendant's contention is premised on the factual assertion that the victims were dead at the time their vehicles were taken.  But the portions of the record that he cites as the basis for that assertion do not support it.  Specifically, the testimony on which defendant relies consists only of the testimony of the two coroners who performed the autopsies of the victims concerning *the cause of death of the victims*.  That testimony does not mention, much less establish, when the victims died; it merely explains how they died.  Moreover, neither coroner was asked to provide a specific time of death for the respective victims, and the record does not contain that information.  Defendant has therefore failed at the outset to set forth any evidence to support the factual premise of this contention on appeal.

Even assuming that there was some testimony from which a time of death for each victim could reasonably be inferred—such as, for example, the testimony of Rodriguez's coroner that one of her wounds was inflicted postmortem and she would have lost all her blood within six minutes of her fatal wound or the estimate by Perez's coroner that Perez would have died within "several minutes" of his fatal wound—defendant's contention nevertheless lacks merit.

Vehicle Code section 10851, subdivision (a) provides, in pertinent part, "Any person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with the intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle, or any person who is a party or an accessory to or an accomplice in the

17

driving or unauthorized taking or stealing, is guilty of a public offense . . . ."  Seizing on the statute's use of the personal pronouns "his or her" in connection with its use of the term owner, defendant concludes that the unlawful taking prohibition applies only when a defendant intends to deprive a natural person of his or her right to title to or possession of a vehicle.

Even if defendant's overly restrictive statutory construction were correct, however, that construction does not warrant reversal of defendant's convictions on counts 19 and 20.  Under California law, a decedent's right to title to and possession of property vests immediately upon death in his heirs and remains with them until an administrator is appointed, at which time the administrator is entitled to temporary possession, but title is still held by the heirs.  (*United States F. & G. Co. v. Mathews* (1929) 207 Cal. 556, 559; *Graybiel v. Burke* (1954) 124 Cal.App.2d 255, 262.)  Therefore, when defendant took, or aided and abetted in the taking of, the murder victims' vehicles, he either deprived the victims of title to and possession of their vehicles or he deprived their heirs—natural persons—of those same property interests in those vehicles.  In either case, he violated the statute under which he was charged in counts 19 and 20.

**D.    Sentencing on Unlawful Taking of a Vehicle Convictions**

As noted, the jury found defendant not guilty in counts 19 and 20, grand theft auto, under section 487, subdivision (d), but found him guilty on those counts of the lesser included offense of unlawful taking of a vehicle in violation of Vehicle Code section 10851, subdivision (a).  Defendant asserts that his convictions on counts 19 and 20 must be vacated because, in orally pronouncing sentence on those counts, the trial court referred to section 487, subdivision (d), the section under which defendant was originally charged on counts 19 and 20.  In response, the Attorney General concedes that the trial court mistakenly referred to the Penal Code section under which defendant was originally charged, instead of the lesser included Vehicle Code offense under which the jury found him guilty.  But the Attorney General maintains that remand is unnecessary because the

18

minute order for the sentencing hearing and abstract of judgment correctly reflected that defendant was convicted of violating Vehicle Code section 10851, subdivision (a).

Because the trial court's oral pronouncement of sentence on counts 19 and 20 conflicts with the minute order for the sentencing hearing and the abstract of judgment, and because the Attorney General agrees that the oral pronouncement of sentence on those counts was incorrect and did not accurately reflect the jury's verdict on those counts, the oral record of the sentences on counts 19 and 20 must be corrected, as the oral pronouncement is the judgment of the trial court, not the minutes or the abstract. (*People v. Mesa* (1975) 14 Cal.3d 466, 471 [oral pronouncement of sentence may control over a conflicting document, such as a minute order or an abstract of judgment, because the oral pronouncement constitutes the rendition of judgment and the written document is ministerial]; and (*People v. Freitas* (2009) 179 Cal.App.4th 747, 750, fn. 2.) Accordingly, we remand this matter to the trial court with directions to vacate the sentences orally pronounced on counts 19 and 20 and to pronounce orally sentences on those two counts that accurately reflect the jury's verdicts and the trial court's intended sentences on those counts.

### E.    Jury Question on Gun Possession

Defendant contends that the trial court erred when it answered a jury question related to the gun allegations. According to defendant, based on the trial court's comments made outside of the presence of the jury, it is clear that the court improperly advised the jury that a witness's subjective belief that an object was a gun could be sufficient to show that a person possessed a firearm, regardless of whether that belief was objectively reasonable.

#### 1.    Background

During deliberations, the jury submitted to the trial court the following written question:  "[I]s the belief of a witness or victim that an object is in fact a firearm sufficient to meet the definition under CALCRIM [Nos.] 3146, 3115, and 3131?"  After

19

discussing the issue with counsel, all counsel agreed that the trial court should provide the jury with the following written response: "The belief of a witness or victim that an object is in fact a firearm is a factor that can be considered with all the other circumstances to determine whether a person possessed a firearm beyond a reasonable doubt."

### 2. *Analysis*

Citing to comments made by the trial court during its discussion of the jury's question with counsel—comments that were made outside the presence of the jury— defendant argues that the trial court's answer "permitted [the jurors] to equate [a witness's subjective belief, whether or not reasonable] with the [gun] enhancement itself." Even assuming that certain of the trial court's comments to counsel were erroneous, those comments are irrelevant to the analysis because they were not made in the presence of the jury. And, the written response that the trial court gave to the jury pursuant to the stipulation of the parties was an accurate statement of the law generally. (See *People v. Aranda* (1965) 63 Cal.2d 518, 532-533 ["If the weapon cannot be found, the jury may be instructed by the court that it may draw an inference from the circumstances surrounding the robbery that the gun was not a toy. Testimony to the effect that the defendant was flourishing the pistol or pointing it at the victim and was using threatening words or conduct indicating that he intended to fire it if his demands were not met would be evidence from which the inference could be drawn"].) Thus, if defendant believed that the trial court's response needed to be clarified by, for example, specifying that the witness's belief must be objectively reasonable, it was incumbent upon defendant's counsel to request such a clarification. (*People v. Whalen* (2013) 56 Cal.4th 1, 81-82 ["'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal . . . .' (*People v. Lee* (2011) 51 Cal.4th 620, 638 [122 Cal.Rptr.3d 117, 248 P.3d 651])"].) Because defendant's trial counsel did not request a clarification, and instead

20

agreed with the trial court's written response to the jury's question, he has forfeited this contention on appeal.

### F. Full Firearm Enhancement on Subordinate Robbery Convictions

Defendant contends, and the Attorney General agrees, that the trial court erred when it imposed a full 10-year gun use enhancement under section 12022.53, subdivision (b) on each of the two subordinate robberies charged in counts 4 and 5. But the Attorney General further asserts that the trial court also erred when it imposed a one-third the middle term gun enhancement under section 12022.5, subdivision (a)[15] on count 7, witness dissuasion by force or threat. According to the Attorney General, under the alternative sentencing scheme set forth in section 1170.15, the trial court was required to impose the full term for the gun enhancement on the witness dissuasion count. (§1170.15 ["the subordinate term for each consecutive offense that is a felony described in this section shall consist of the full term of imprisonment for the felony for which a consecutive term of imprisonment is imposed, and shall include the full term prescribed for any enhancements imposed for being armed with or using a dangerous or deadly weapon or firearm"].) Witness dissuasion in violation of section 136.1 is a felony described in section 1170.15.

We agree with the parties that the trial court erred when it imposed full 10-year sentence enhancements under section 12022.53, subdivision (b) on the subordinate robbery convictions on counts 4 and 5. We also agree, however, with the Attorney General that the trial court erred when it imposed a one-third the middle term enhancement under section 12022.5, subdivision (a) on the witness dissuasion conviction on count 7.

---

[15]     The reporter's transcript of the sentencing hearing reflects that, as to count 7, the trial court imposed a gun enhancement under the section 12022, subdivision (a)(1) allegation, but the jury verdict form on that count reflects that the jury made a true finding only on the section 12022.5, subdivision (a) allegation.

It is well established that we are empowered to correct an unauthorized sentence on appeal without remand for further proceedings in the trial court. (*People v. Sanders* (2012) 55 Cal.4th 731, 743 ["it is well established that the appellate court can correct a legal error resulting in an unauthorized sentence (including a misapplication of § 654) at any time. (*People v. Scott* (1994) 9 Cal.4th 331, 354 & fn. 17 [36 Cal.Rptr.2d 627, 885 P.2d 1040])"].) We therefore modify defendant's sentence on counts 4 and 5 to reflect that he received a one-third the middle term sentence enhancement under section 12022.53, subdivision (b) on each count. As to defendant's sentence on count 7, we modify that sentence to reflect that he received a full middle term sentence enhancement under section 12022.5, subdivision (a) on count 7.

### G.      Stay on Robbery and Kidnapping Convictions

Defendant maintains that the trial court should have stayed under section 654 his sentences on counts 3 and 4, the robberies of murder victims Perez and Rodriguez, as well as his sentence in count 6, the kidnapping of Rodriguez for robbery. According to defendant, the acts that supported the jury's true findings on the robbery and kidnapping special circumstances allegations were the same acts that supported the guilty verdicts on the robberies of the two murder victims and the kidnapping of Rodriguez for robbery. Therefore, defendant argues, the trial court erred when it imposed consecutive determinate sentences on the two counts of robbery of the murder victims and the one count of kidnapping for robbery because the robberies and kidnapping formed the basis of the two special circumstance felony murder convictions for which defendant was also punished.

Section 654, subdivision (a) provides in pertinent part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "Section 654, subdivision (a), prohibits multiple punishment for the same act . . . . Section 654 prohibits only multiple punishment, not multiple convictions, for the same act. (*People v. Britt* (2004) 32 Cal.4th

22

944, 951 [12 Cal.Rptr.3d 66, 87 P.3d 812].) [¶] The California Supreme Court has stated: 'The test for determining whether section 654 prohibits multiple punishment has long been established: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* [(1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]].) A decade ago, we criticized this test but also reaffirmed it as the established law of this state. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1209-1216 [23 Cal.Rptr.2d 144, 858 P.2d 611].) We noted, however, that cases have sometimes found separate objectives when the objectives were either (1) consecutive even if similar or (2) different even if simultaneous. In those cases, multiple punishment was permitted. [Citation.] . . . [¶] Section 654 turns on the *defendant's* objective in violating both provisions . . . .' (Footnote omitted.) (*People v. Britt, supra*, 32 Cal.4th at pp. 951-952.) [¶] 'Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.' (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 [127 Cal.Rptr.2d 319].) '[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*' (*Bowers* [*v. Bernard* (1984)] 150 Cal.App.3d [870,] 873-874.)" (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1377-1378.)

In *People v. Nguyen* (1988) 204 Cal.App.3d 181 (*Nguyen*), the defendant robbed a store with an accomplice. While the defendant remained at the cash register, his accomplice took the victim store clerk to a back room, took his valuables, forced him to lie on the floor, and then shot him. (*Id.* at p. 190.) According to the court in *Nguyen*, "[t]his act constituted an example of gratuitous violence against a helpless and unresisting victim which has traditionally been viewed as not 'incidental' to robbery for purposes of Penal Code section 654. (E.g., *People v. Cardenas* (1982) 31 Cal.3d 897 [184 Cal.Rptr. 165, 647 P.2d 569] [robber shot one victim in the back for no apparent reason while another victim opened safe]; *People v. Massie* (1967) 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869] [robber shot victim for looking at him strangely]; *People v. Chapman* [(1954)] 43 Cal.2d [385,] 387 [assault following robbery]; *In re Jesse F.* (1982) 137 Cal.App.3d 164 [186 Cal.Rptr. 841] [victim assaulted after robbery while attempting to escape from assailants]; *People v. Williamson* (1979) 90 Cal.App.3d 164 [153 Cal.Rptr. 48] [victims assaulted after money already taken and gun put away]; *People v. Hopkins* (1975) 44 Cal.App.3d 669 [119 Cal.Rptr. 61] [victim struck after she was tied up]; *People v. Johnson* (1969) 270 Cal.App.2d 204 [75 Cal.Rptr. 605] [robber gratuitously fired gun at victim during flight from scene].)" (*Id.* at p.191.)

The court in *Nguyen, supra*, 204 Cal.App.3d 181 concluded that section 654 "cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense. Once robbers have neutralized any potential resistance by the victims, an assault or attempt to murder to facilitate a safe escape, evade prosecution, or for no reason at all, may be found by the trier of fact to have been done for an independent reason." (*Id.* at p. 191.)

Here, there was evidence supporting a reasonable inference that defendant and Canales had more than one objective when they robbed the murder victims and kidnapped Rodriguez. The evidence showed that the victims' resistance had been neutralized before the murders and, in the case of Rodriguez, the robbery of her bank funds had been completed prior to her murder. Moreover, in addition to viciously cutting the victims' throats, both Canales and defendant made statements suggesting that the

24

murders were committed, not merely to facilitate the robberies, but as "payback" for the victims' refusal to pay Canales money they owed him. In addition, both defendant and Canales stated that they needed to kill R.D. because she could identify them, evidence that supported an inference that Canales killed the victims to prevent them from identifying and testifying against defendants. Because the evidence supported a finding that defendants had different intents in killing the victims than they had in committing the robberies and the kidnapping, the trial court was not required to stay the sentences on counts 3, 4, or 6.

### H. Presentence Custody Credits

Defendant asserts that he was entitled to an additional 17 days of presentence custody credit based on an arrest date of November 19, 2007, and a sentencing date of December 18, 2012. The Attorney General agrees that defendant was entitled to additional presentence custody credit, but argues that the amount of additional credit is uncertain because the record reflects two different dates for defendant's arrest—November 19, 2007, based on the testimony of the Utah deputy sheriff who arrested defendant, and November 28, 2007, based on the probation officer's report.

Because the record shows that defendant was entitled to additional presentence custody credit, but does not allow us to calculate the correct amount of such credit, we reverse the award of presentence custody credit and remand the issue of the correct amount of additional presentence custody credit to the trial court with instructions to resolve that issue and enter a new award of presentence custody credit based thereon.

# DISPOSITION

The trial court's oral pronouncement of sentence on count 19 and 20 is reversed and the matter is remanded to the trial court to pronounce orally sentences on those counts that conform to the jury's verdicts and the court's intended sentences on those counts. The sentences on counts 4, 5, and 7 relating to the gun enhancements are hereby modified as follows: on counts 4 and 5, defendant shall be punished by a consecutive one-third the middle term sentence enhancement under section 12022.53, subdivision (b), and on count 7, he shall be punished by a full middle term sentence under section 12022.5, subdivision (a). The award of presentence custody credit is reversed and the matter is remanded to the trial court to resolve the issue of the additional amount of presentence custody credit to which defendant is entitled and to award defendant presentence custody credit based upon the additional credits to which he is entitled.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

MINK, J.[*]

---

[*] Retired Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article IV, section 6 of the California Constitution.