Filed 9/22/14  P. v. King CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMAL LAMAR KING et al.,<br><br>    Defendants and Appellants. | B247438<br><br>(Los Angeles County<br>Super. Ct. No. TA120452) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed.

        Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Jamal Lamar King.

        Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant Melvin Lemon.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Defendants Jamal Lamar King and codefendant Melvin Lemon appeal their conviction in count 1 for the murder of Oscar Arevalo (Pen. Code,[1] § 187), with true findings that in committing the offense, each of the defendants personally and intentionally discharged a firearm causing death and that the offense was gang related (§§ 12022.53, subd. (d), 186.22, subd. (b)(1)(C)).  Defendant King appeals his conviction of possession of a firearm by a convicted felon, with a true finding the possession was gang related (§§ 12021, subd. (a)(1),[2] 186.22, subd. (b)(1)(A); counts 2 & 8), assault with a firearm on a peace officer (§ 245, subd. (d); counts 5 & 7).  Defendant Lemon appeals his conviction of possession of a firearm by a convicted felon, with a true finding the possession was gang related (§§ 12021, subd. (a)(1), 186.22, subd. (b)(1)(A); count 3).

Defendants argue that the trial court erred in (1) refusing to sever their trials; (2) admitting their statements to a jailhouse informant; (3) admitting evidence of King's statements about his violent propensities; (4) denying their motion for a mistrial, and (5) erroneously sentencing Lemon.  We affirm the judgment.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 11, 2011, at approximately 8:50 a.m., Oscar Arevalo, a member of the Varrio Grape Street gang who was also known as "Knuckles," was gunned down at the corner of Wilmington and 106th Street in Los Angeles.

An information filed June 14, 2012 charged King and Lemon jointly in count 1 for the murder of Oscar Arevalo (§ 187), with the allegations that they personally used a firearm in the commission of the offense (§ 12022.53, subd. (d)) and that the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).[3]  The information further alleged in counts 2 and 8 that King was a convicted felon in

---

[1] All further statutory references herein are to the Penal Code unless otherwise indicated.

[2] Section 12021, subdivision (a)(1) is now section 29800, subdivision (a)(1).

[3] Damoria Foley was also charged as a codefendant in this count.  Foley is not a party to this appeal.

2

possession of a firearm (§ 12021, subd. (a)(1)), in counts 4 and 6 that King, with codefendant Alvurn Pennie,[4] committed the willful deliberate and attempted murder of Officer Kyle Korinek (§§ 664, 187, subd. (a)), in counts 5 and 7 that King, with codefendant Pennie, committed assault with an automatic firearm on a peace officer (§ 245, subd. (d)(2)), and in count 9 that Pennie committed the willful and deliberate attempted murder on September 26, 2011 of Sandro Preza. It was further alleged that counts 2 through 8 were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b).

### 1. October 11, 2011, Shooting of Oscar Arevalo (Counts 1, 2, 3)

Craig Kredell, a paramedic with the Los Angeles City Fire Department, was driving on Wilmington approaching 106th Street at 8:50 a.m. on October 11, 2011, when he heard loud noises which sounded like fireworks or gunfire. Based on his experience, Kredell believed it was gunfire. He was near a liquor store, and he saw people running across the street in "all different directions." He saw two men running his way, and one of them had a gun. The men ran past him down an alley near a market. Kredell could not see the men's faces, and could not remember what they looked like or what they were wearing. The gun one of the men was carrying was black and "funny looking."

Kredell, drove to the end of the block and turned around and came back to the scene, where he found Arevalo face down with his upper body on the sidewalk. Kredell checked Arevalo for vital signs and determined he was deceased.

Aurelia Lorenzo Perez was at her tamale stand where she sold her tamales every day. Arevalo was standing near the street corner, about eight to 10 feet away. Perez's cart was between her and the street. Perez had her head down when the shooting

---

[4] The counts relating to Pennie were not tried because he accepted a plea bargain.

occurred, and heard a loud noise but could not see how many people were shooting, nor could she see the shooter.

2.      *The Coroner's Report*

Arevalo had 21 gunshot wounds to his body.  Three gunshot wounds to the back were fatal because they hit his lungs and heart and caused a lot of tissue damage.  Three bullets went completely through Arevalo's head.

3.      *King's October 19, 2011 Encounter with Officers Korinek and Torres (Counts 4, 5, 6, 7, 8)*

On October 19, 2011, shortly after 2:00 p.m., Officer Kyle Korinek was working in his marked patrol car in the southeast division with his partner Officer Salvador Torres.  Officer Torres was driving.  The officers were heading westbound on 104th Street approaching Graham Street.  They observed a speeding white Buick Regal proceeding northbound on Graham Street, and after checking the car for warrants, discovered that its registration had expired.  The officers activated their overhead lights and emitted bursts from their siren.  The Buick did not stop but continued until it pulled into a driveway of a shopping center.

The Buick slowed and the passenger side door opened.  Officer Korinek saw King's foot and then the muzzle of a gun.  King leveled the gun, which had an extended magazine, at the officers and Officer Korinek saw the gun "jerking downward" about three times.  King's gun was pointed at him for about three seconds.  Officer Korinek was about 15 or 20 feet away from King.  Officer Korinek started to unholster his gun and get out of the patrol car, but by the time he got out of the car, King had run off.  At trial, Officer Korinek demonstrated that the movement of the gun indicated that King was pulling the trigger of the gun.

Officer Korinek took off on foot after King.  King climbed the fence surrounding the shopping center and threw the gun over the fence.  Officer Korinek commanded King to get down, but King did not do so.  King went back toward the driveway and crossed the street going southbound.  The officers set up a perimeter.  A police helicopter located

and followed defendant in the area. Defendant climbed on a roof and officers surrounded the house. About an hour and a half later, defendant was detained. Officers found a broken cell phone on the roof of the house that defendant had been observed using. Police recovered a gun from the shopping center where they had confronted King. The safety of the gun was engaged.

The patrol car the officers were driving had a dash cam, which recorded the event. The recording was played for the jury.

The parties stipulated that Lemon was not the driver of the Buick during this incident.

### 4. *Ballistic Evidence*

Police found 18 spent nine-millimeter bullet casings, three expended bullets, and four bullet fragments in the area where Arevalo was shot. In addition, an expended bullet was found in one of Arevalo's hands, and a bullet fragment was found in the sleeve of his sweatshirt. Six bullets were removed from his body and a seventh was found in his clothing.

Carole Acosta, a firearms examiner with the Los Angeles Police Department, concluded that 13 of the bullet cases recovered from the scene of the Arevalo shooting were fired from the same weapon, but did not come from the gun King threw over the fence after confronting Officer Korinek on October 19, 2011. However, six of the expended cases found at the site of the Arevalo shooting came from the same gun that King threw over the fence, a Beretta, as did three of the bullets removed from Arevalo's body during the autopsy.

*5.    Confidential Informant*

*(a)    **Defendant King***

On October 19, 2011, King was placed in a jail cell with a confidential informant.[5] The informant wore a video and audio recorder. A video of King's conversation with the informant was played for the jury.

King told the informant that he was in for an attempted murder of a police officer. The informant asked how King was charged with attempted murder if King had not "bust[ed]" at the police. King responded, "I just drew on them." King admitted that he was trying to shoot at the police, but the safety of his gun was on. King told the informant about his escape on foot, and claimed he would have gotten away but for the helicopter. King stated that the police had gotten his gun, which was an extended clip Beretta. King stated his moniker was "Badass" and that he was the only Badass in his gang. When King stated that he had been with another person in that person's mother's car, the informant asked whether it was the person he had been with when he shot Arevalo. King responded, "No. That was Lil Rider [with] me."

King had a gun with him at the time because he had seen someone drive by he thought might be with Southside, and he had gone home to pick up the gun. While driving, they went by a yard where there were "paisas," meaning Hispanics who were not Southside gang members. King claimed he would have shot the "paisas" because they associated with members of the Southside gang.

King asked the informant if he had heard about "Knuckles's" murder. When the informant asked if "Knuckles" had been by himself, King responded that he was with his "auntie" (Perez) at the corner of 106th and Wilmington. King told the informant that they used a Glock and a Beretta to shoot Arevalo, and that King shot Arevalo in the head 13

---

[5] The informant was paid between $1,500 and $1,700 for acting as an informant. At the time of the informant's jailhouse conversation with King, the informant was not incarcerated, nor was the informant the subject of any pending criminal charges. The informant came from a Compton gang that was bigger than the Fudge Town Mafia Crips.

6

times. Lemon shot the "tamale lady" (Perez) in the leg. The informant asked what was up with the Southsides,[6] and King stated, "We gonna kill them all" and there was "only a handful left." The murder of Arevalo was retaliation for the Southside killing of Chuck Wayne, a Fudge Town Mafia Crips member who was killed on August 28, 2011.

King claimed that all his shots at the victim were "head shots," he saw the victim's brain matter come out, and it would be a "closed casket for sure." Everyone in the clique that King belonged to had committed a murder; he told the informant that "we got a cold little pack . . . . [E]verybody got murders in our pack." In response to the informant's comment "so it was you and Lil Neefy though," King responded that "me and Baby Neefy knocked the nigga Knuckles."

### (b) Defendant Lemon

On October 20, 2011, the same informant was placed in a cell with Lemon. The conversation with Lemon was recorded, and the video was played for the jury. Regarding the October 19, 2011 incident, Lemon told the informant how King had thrown the gun over the fence and had been trapped on the roof while trying to evade police. King called Lemon on his cell phone and told him to retrieve the weapon. Lemon could not do so because the police were nearby. Lemon asked the informant if he had heard about Knuckles; and Lemon said, "man, that was me and my boy [King]." Before the shooting, King saw Arevalo on the street and went to get Lemon. The informant asked which gun had been used to kill Arevalo, and Lemon responded that he had the Beretta and King had the Glock. Lemon bragged that over 20 murders had been committed with the Beretta.

Lemon described shooting Arevalo with his gun barrel to Arevalo's head, "ploom, ploom, ploom." Arevalo was shot 15 times in the face and three times in his body, which Lemon described as "slaughter" rather than "murder." In Lemon's view, the funeral would be closed casket.

---

[6] "South Sides" are Hispanic gangs that are south of Bakersfield.

*6.      Gang Evidence*

Officer Samuel Marullo worked as a gang officer for the Los Angeles Police Department. In the southeast division, there are approximately 63 gangs. The Fudge Town Mafia Crips claim territory within Watts in the southeast division, and the shooting of Arevalo occurred in Fudge Town Mafia Crip territory. At the time, the Fudge Town Mafia Crips had about 80 members. The gang primarily engages in murders, robberies, burglaries, handgun possession, narcotics sales, and graffiti. Graffiti identifies the members of the gang in the neighborhood, and when another gang crosses it out, that is extremely disrespectful. The Fudge Town Mafia Crips have rivalries with the East Side Grape Street gang and the Watts Varrio Grape Street gang. Watts Varrio Grape Street is primarily Hispanic, while East Side Grape Street is primarily black. Fudge Town Mafia Crips and Watts Varrio Grape Streets territories overlap.

Officer Marullo was familiar with all of these gangs. Until 2008, the Watts Varrio Grape Street gang had a good relationship with the Fudge Town Mafia Crips, but in 2008 a Fudge Town Mafia Crips gang member was murdered by a Watts Varrio Grape Street gang member resulting in a war between the gangs. Alvurn Pennie was a Fudge Town Mafia Crips gang member with the moniker of "Lil Ryda." Pennie had tattoos and attire consistent with membership in the gang. Lemon and King also had gang tattoos. Lemon's moniker was "Baby Nefee." The prefix "baby" indicated that Lemon was further down in the gang lineage, for example, his name could indicate he was below "Big Nefee" or and "Lil Nefee." Both Lemon and King were members of the Fudge Town Mafia Crips based upon their own admissions, their monikers, and tattoos.

In Marullo's opinion, the charged crimes were committed for the benefit of the gang. Gang members will commit crimes together because they all know the business and understand the rules. Gang members know what they need to do to get away with crimes and then complete the crime successfully. Gangs will commit killings to eliminate an enemy, which has a deterrent effect on other gangs by sending a message to them that the killing was a violent consequence to being an enemy of the gang. Killings also

8

increase the respect level for the gang. Respect means everything to a gang. Respect is equated with fear, and the more a gang is feared, the more it is respected. Also, respect attracts new gang members.

Pennie's mother owned the white Buick. A memorial set up at the location of Arevalo's murder was knocked over. There was shattered glass and candles in the street.

The parties stipulated that Lemon and King each had previously been convicted of a felony.

7. *Defense Case*

Defendants did not put on a defense.

The jury found King guilty of counts 1, 2, 5, 7 and 8, and Lemon guilty of counts 1 and 3. The jury also found the firearm and gang allegations true. The trial court consecutively sentenced appellant King as follows: On count 1, 25 years to life plus 25 years to life for the firearm enhancement; on count 5 (principal term), the upper term of nine years, plus 10 years for the gang enhancement, plus 10 years for the firearm enhancement; on count 7, one-third the middle term of six years, or two years and four months; plus one-third the middle term of 10 years, or three years and four months, on the firearm enhancement; plus one-third the middle term of 10 years, or three years and four months, on the gang enhancement. The court also imposed seven-year sentences on counts 2 and 8 and ran those concurrently.

The trial court consecutively sentenced appellant Lemon as follows: On count 1, 25 years to life plus 25 years to life for the firearm enhancement; on count 3, the upper term of three years plus four years for the gang enhancement attached to that count.

## DISCUSSION

### I. Severance of Defendant Lemon's Trial on Count 1

Lemon argues that the trial court erred in denying his motion for severance of the charges against him relating to Arevalo's shooting with the charges relating to King's encounter with Officers Korinek and Torres, contending the joint trial improperly permitted him to be convicted based on his association with King.

9

### A.    *Factual Background*

Before trial, Lemon moved to sever the trial on counts 1 through 3, related to the shooting of Arevalo on October 11, 2011 (charged against him and codefendant King), from the trial on counts 4 through 9, related to the attempted murder of the two police officers on October 19, 2011 (which were not charged against Lemon).  Lemon argued that because the two incidents were separate and involved distinct witnesses and evidence and there was a risk of guilt by association, he should not be tried with King in connection with the attempted murder.  King also moved for severance, arguing that counts 1 through 3 were improperly joined with counts 4 through 8, asserting the evidence was not cross-admissible, and King was not charged in any count in which all of the other defendants were charged, creating the risk of a spillover effect based on prejudicial association with the other defendants and confusion to the jury.

At the hearing, the trial court observed that there was an abundance of cross-admissibility, citing the gang evidence, and observed that the evidence from the attempted murder could be used to show consciousness of guilt and to explain why King was running from the officers.  Further, the court stated it would admonish the jurors that Lemon was not the driver at the attempted murder of the officers.  The court denied the motions.

After a week of deliberation, the jury initially deadlocked on the charges against Lemon, with a majority of the jury advising the court they needed more time to reach a verdict, but declining further instruction, argument from counsel, or readback of evidence.  After additional deliberation, the jury reached a verdict against Lemon.

### B.    *Discussion*

Section 954 permits two or more offenses of the same class or connected together in their commission to be consolidated for trial against a single defendant.  "[B]ecause consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by law."  (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).)  "A unitary trial requires a single courtroom, judge, and court attaches.

10

Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process." (*People v. Bean* (1988) 46 Cal.3d 919, 939–940.)

When the statutory requirements for joinder have been met, the defendant can demonstrate error in the denial of a motion to sever only by a clear showing of potential prejudice. (*People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*).) "A trial court's denial of a motion for severance of charged offenses amounts to a prejudicial abuse of discretion if "'the trial court's ruling "'falls outside the bounds of reason.'"'"" (*Alcala*, *supra*, 43 Cal.4th at p. 1220.)

"In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.' . . . [¶] First, we consider the cross-admissibility of the evidence in hypothetical separate trials. [Citation.] If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. [Citation.] Moreover, even if the evidence underlying these charges would *not* be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges." (*Soper*, *supra*, 45 Cal.4th at pp. 774–775.) In terms of a severance motion, cross-admissibility requires that "'evidence pertinent to one case [would] have been admissible in the other under the rules of evidence which limit the use of character evidence or prior similar acts to prove conduct (Evid. Code, § 1101, subds. (a) and (b)).'" (*People v. Johnson* (1988) 47 Cal.3d 576, 589.)

If the evidence underlying properly joined charges would not be cross-admissible, we consider "'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other crimes" evidence on the jury . . . . [Citation.] In making that assessment, we consider three additional factors, any of which—combined

with our earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.] We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state." (*Soper*, *supra*, 45 Cal.4th at p. 775; see *Alcala*, *supra*, 43 Cal.4th at pp. 1220–1222.) Other factors considered in granting or denying severance include "prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*People v. Massie* (1967) 66 Cal.2d 899, 917, fns. omitted.)

Here, Lemon argues that the gang evidence was only relevant to prove the gang allegations and did not establish he shot Arevalo; the murder of Arevalo may have provided an explanation of why King shot the officers, but did not establish Lemon shot Arevalo; the evidence concerning King's shooting of the police officers was stronger (it was captured on video) than the evidence of the shooting of Arevalo (there were no eyewitnesses); instruction to the jury that Lemon did not drive the Buick in the October 19, 2011 incident was insufficient to prevent association with King; King's statements to the informant were similarly prejudicial by creating guilt by association; and the jury's initial deadlock on the counts against Lemon shows that the jury's verdict would not necessarily have been the same absent severance.

First, joinder of the charges was proper. Offenses are connected together in their commission if they share an "'"'element of substantial importance."'"' (*Alcala*, *supra*, 43 Cal.4th at p. 1218, italics omitted.) The requirement may be satisfied "even though 'the offenses charged "do not relate to the same transaction and were committed at different times and places . . . against different victims."'"' (*Ibid*.) Here the offenses were

12

connected within the meaning of section 954 because they shared a common element of substantial importance: furtherance of the Fudge Town Mafia Crips gang members' intent to intimidate, terrorize, and bully both the neighborhood and the immediate victims of their acts of violence. (See *id.* at p. 1219 [the "intent or motivation with which different acts are committed can qualify as a 'common element of substantial importance' in their commission and establish that such crimes were 'connected together in their commission'"].) The record is replete with evidence of this intent to terrorize and intimidate and acts to further defendants' gang agenda: Lemon's and King's shooting of Arevalo in retaliation for the gang killing of Chuck Wayne; King's statements he would have shot the "paisas" even though they were not gang members; King's attempts to shoot the officers who would arrest him; and King's attempt to dispose of the Beretta by calling Lemon.

Further, Lemon's arguments fail to establish he was prejudiced by the joinder of his trial with King's trial. There was cross-admissible evidence in the form of the Beretta, which Lemon used to shoot Arevalo and which King used to shoot at the police officers; the abundant evidence of both King and Lemon's gang membership and the rivalry with Arevalo's gang; and King's motivation to shoot at the officers to escape capture and his belated attempt to dispose of the Beretta used in the shooting. Lemon further fails to show association with King caused the jury to convict him; rather, Lemon's own statements to the jailhouse informant, coupled with the eyewitness testimony describing the shooting, were robust evidence of his guilt. For that reason, we also disagree with Lemon that his was a "weak" case joined with a stronger case. The evidence on both cases was of similar consequence: The two defendants' statements to the jailhouse informant were remarkably consistent in their detail concerning the Arevalo incident, setting forth the motivation, commission, and aftermath. Finally, the fact the jury may have initially had trouble reaching a verdict on those counts against Lemon does not automatically create an inference of prejudice. When queried by the court what would assist them in reaching a verdict, the jury did not ask for clarification of the law,

13

request any read backs of evidence, but instead stated they needed more time, indicating any roadblock to a verdict was not caused by confusion over the facts, law, or the arguments of counsel.

## II. Admission of Codefendants King and Lemon's Statements Implicating Each Other

Lemon and King argue that the trial court prejudicially violated their Sixth Amendment confrontation rights when it admitted their jailhouse statements about the crimes against each other. Further, even if nontestimonial, King argues admission of Lemon's statements against him violated his confrontation clause rights, asserting that the Supreme Court's recent decisions limiting the confrontation clause to testimonial statements have not considered whether the rule extends to codefendants. Finally, King argues that Lemon's statements about King's participation in the crimes did not constitute admissions against interest with respect to Lemon and were therefore inadmissible hearsay.

### A. Factual Background

Both King and Lemon objected to the admission of their conversations with the jailhouse informant on hearsay and confrontation clause grounds. The court denied the motion, finding the statements nontestimonial under *Crawford* v. *Washington*[7] and that the statements were declarations against interest under Evidence Code section 1230.

The only statement not admitted against King was Lemon's statement about his inability to retrieve the Beretta after King threw it off the roof and Lemon's statement that the weapon had "too many murders on it." The trial court concluded these statements were not declarations against Lemon's interest because he was not charged in connection with the October 11, 2011 incident, but the statements could be used to show his state of mind (consciousness of guilt).

---

[7] *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*).

14

### B. Discussion

#### 1. The Defendants' Conversations with the Jailhouse Informants Were Not Testimonial

The Sixth Amendment bars the "admission of testimonial statements of a [declarant] who [does] not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. 36 at pp. 53–54.) The confrontation clause is not implicated by statements that are not testimonial. (*Crawford*, at p. 59, fn. 9.) Testimonial evidence includes formal testimony and statements resembling testimony, such as responses to police interrogation undertaken to obtain evidence to be used at trial. (*Davis v. Washington* (2006) 547 U.S. 813, 830 [126 S.Ct. 2266, 165 L.Ed.2d 224] (*Davis*); *Crawford*, at pp. 51–52.)

On the other hand, an "off-hand, overheard remark" is not testimonial, even if it is inadmissible hearsay. (*Crawford*, *supra*, 541 U.S. at p. 51.) Thus, a conversation between prisoners and a secretly recorded statement to a government informant are both nontestimonial. (*Davis*, *supra*, 547 U.S. at p. 825.) As federal courts have repeatedly held, "statements unwittingly made to an informant are not 'testimonial' within the meaning of the confrontation clause." (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402.) Moreover, secretly recording such statements to preserve them as evidence does not render them testimonial. (See *id*. at pp. 1402–1404.) Here, both defendants believed they were speaking to a gang associate and were unaware they were being recorded. Thus, the conversations between defendants and the paid informant were nontestimonial and did not implicate the Sixth Amendment.

#### 2. Admissibility of Codefendant Statements

The *Aranda/Bruton* rule bars the admission of one defendant's out-of-court confession incriminating a codefendant, even if the court instructs the jury to consider the confession only against the declarant. (*People v. Aranda* (1965) 63 Cal.2d 518, 529–530; *Bruton v. United States* (1968) 391 U.S. 123, 135–136 [88 S.Ct. 1620, 20 L.Ed.2d 476].) The *Aranda/Bruton* rule presumes the out-of-court statement is admissible against the

15

declarant and inadmissible hearsay against the codefendant. (*People v. Fletcher* (1996) 13 Cal.4th 451, 455.) Under such circumstances, the trial court must either sever the trials or redact the statement to avoid references to the codefendant. (*Aranda*, at pp. 530–531.) In *People v. Garcia* (2008) 168 Cal.App.4th 261, 282, footnote 12, the court observed that "[w]hether the *Aranda/Bruton* rule applies only to extrajudicial *testimonial* statements appears to be an unsettled question." However, "since . . . *Garcia*'s observation, a number of federal courts have expressly held that the *Bruton* rule does not apply to nontestimonial statements." (*People v. Arceo* (2011) 195 Cal.App.4th 556, 574.) Thus, following *Arceo*, we find that the *Aranda/Bruton* rule does not apply to these nontestimonial statements.

### 3. The Statements Were Declarations Against Interest

Further, the statements were admissible as declarations against interest. Declarations against interest are a firmly rooted exception to the hearsay rule. (*People v Riccardi* (2012) 54 Cal.4th 758, 833, fn. 36.) "The proponent of [evidence of a declaration against penal interest] must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610–611.) "[A]s the high court has noted, 'whether a statement is self-inculpatory or not can only be determined by viewing it in context.' [Citation.]" (*Id.* at p. 612.) "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334.)

In *People v. Arceo*, *supra*, 195 Cal.App.4th 556, the defendant was a gang member who was charged with two murders and with conspiracy to commit those murders as well as gang allegations. (*Id*. at p. 562.) The defendant objected to a witness's testimony that

16

an accomplice, Sergio, made boastful statements about the murders and described how the defendant shot one of the victims when she resisted. (*Id*. at p. 576.) The court held that, to the extent Sergio's boastful statements admitting his own involvement implicated the defendant, the statements were declarations against interest and admissible under Evidence Code section 1230. (*Ibid*.) Adding to the statements' trustworthiness was the fact that they were not made in a custodial context or in a context that shifted the blame to another. (*Id.* at p. 577.)

Here, King asserts Lemon's statements about King's involvement in the crimes were statements Lemon made in the belief he was bragging to a fellow gang member, were not statements against Lemon's penal interest nor were they reliable, and are therefore inadmissible. However, Lemon's statements implicating King were made in conjunction with statements implicating himself in the Arevalo shooting and were thus an integral part of his own admissible statements against interest. The same can be said of King's statements regarding Lemon's participation in Arevalo's murder. With respect to Lemon's statements about King's escape to the rooftop and request that Lemon dispose of the Beretta, Lemon's potential participation in the disposal of the weapon were statements against penal interest. Further, although both defendants were in custody at the time they made the statements, they were respectively in a cell alone with an informant (believed to be a gang member) and were unaware their conversations with the informant were being taped.

Finally, the admissibility of a declaration against interest depends upon the person hearing the statement. As *People v. Greenberger*, *supra*, 58 Cal.App.4th 298 noted: "Clearly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. '[O]nce partners in crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.' [Citation.] However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures.

17

[Citations.]" (*Id*. at p. 335.) Both defendants' conversations with the jailhouse informant were but one step away from a conversation with a friend: they were in a cell with a man whom they believed to be incarcerated like they were, and whom they believed to be a gang member, like they were.

Even assuming error, any error was not prejudicial whether judged under the state standard for erroneous evidentiary rulings (*People v. Cunningham* (2001) 25 Cal.4th 926, 998–999; *People v. Watson* (1956) 46 Cal.2d 818, 836), or the elevated standard that governs federal rights (*Crane v. Kentucky* (1986) 476 U.S. 683, 690–691 [106 S.Ct. 2142, 2147–2146, 90 L.Ed.2d 636, 645–646]; *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710–711]). Both defendants made sufficient statements regarding their own culpability for the respective crimes with which they were charged to support the jury's verdicts. Lemon testified in detail how he shot Arevalo in the face 15 times such that the funeral would require a closed casket; King similarly stated that all his shots at the victim were "head shots" and the funeral would be a "closed casket for sure." With respect to King's attempted shooting at the officers, he admitted he tried to shoot them but the gun's safety was on.

## III.    Admission of Evidence of Defendant's Violent Propensities

Lemon argues the trial court erred when it made an in limine ruling that the probative value of certain statements King made to the jailhouse informant outweighed the danger of undue prejudice, and admitted those statements. These statements were that appellant's gang was going to kill all South Side Grape Street gang members, everyone in the clique to which appellant belonged had committed murders, and King would have shot a group of Hispanics who were not gang members because they associated with South Side Grape Street members.

### A.    *Factual Background*

At trial, Lemon objected to the admission of King's statement "'[w]e gonna kill ′em all'" on the grounds that because of King's use of "we," the sentiment could be attributed to Lemon, would invite speculation from the jury, and should be excluded

18

under Evidence Code section 352.  The trial court concluded it was a statement of intent by King, referred to the South Side Gang as a whole, demonstrated the rivalry between Fudge Town Mafia Crips and the South Side Gang, and thus should not be excluded.

Counsel also objected the King's statement about his clique being a "'cold little pack,'" was a statement about a prior bad act.  The prosecution asserted the statement did not indicate that King had committed any prior murders but referred to the killing of Arevalo.  The court concluded that it was about the Arevalo killing because King also stated, "'it's me and Baby Nefee'" who had committed the murder.  The court admitted the statement.

Lastly, Lemon's counsel objected to King's statement about paisas because it evidenced a prior bad act, and that although he was not with King at this time, there could be an inference Lemon was involved.  The prosecution argued that the statement showed King's generalized animosity toward Hispanics and his motive in killing Arevalo.  The court admitted the evidence, reasoning that King was referring to what he wanted to do because King said, "'I would have,'" and King was not referring to what he had done in the past.

### B.      Discussion

Evidence Code section 1101, subdivision (a) provides, "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion."  On the other hand, Evidence Code section 1101, subdivision (b) qualifies the prohibition on character evidence, and provides character evidence is admissible when relevant to prove some fact, such as motive or intent.

"'When reviewing the admission of evidence of other [acts], a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other [bad act] evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant.  [Citation.]  Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded."  [Citation.]'

19

[Citation.] "'We review for abuse of discretion a trial court's rulings on relevance and the admission or exclusion of evidence under Evidence Code sections 1101 and 352." [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.) Further, evidence of a "defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Here, the trial court gave an explanation for admitting King's statements: With respect to King's first statement that "'[w]e gonna kill 'em all'" of the South Side Gang, the court stated, in response to defense counsel's assertion that the "we" could not be attributed to Lemon, that "I think he's talking about the South Side . . . Gang as a whole. If you look at it . . . [it] shows the rivalry between Fudge Town and the South Side." With respect to King's second statement, the prosecution argued that the statement was about the gang's clique having committed murders but did not state that King himself had committed a murder. The court observed, "in . . . context . . . I think he's referring to the gang as a whole, but this could be interpreted as an admission as to himself because if you look at the next line, the informant asks, 'so it was you and [Baby] Nefee,' basically. And [King] corrects [the informant] and says, 'it's me and Baby Nefee.' . . . [T]hat's talking . . . about this particular murder of Arevalo. So I think in the context, even withstanding [Evidence Code section] 352, that's going to be admitted."

Lemon contends that the trial court abused its discretion in those determinations of admissibility. We need not resolve whether the trial court abused its discretion in admitting the statements, because we evaluate evidentiary rulings under the *Watson* standard of harmless error, and we will not reverse unless it is reasonably probable the result in defendant's case would have been different if the evidence had not been admitted. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Defendants' shooting of Arevalo was a gruesomely violent act (Lemon termed it a "slaughter"); King's three

20

statements indicating his violent propensities are dwarfed by the carnage of that shooting. In addition, the defendants made numerous other statements evidencing their readiness to resort to violence, in particular their descriptions of the shooting of Arevalo. Given the strong evidence of guilt here, namely, both defendants' admissions in separate conversations with the same informant, Lemon was not prejudiced by admission of King's statements regarding the gang.

## IV. Denial of Mistrial Based upon Prosecution Attempt to Introduce Evidence of Pennie's Conviction

### A. Factual Background

The parties stipulated that Pennie was the driver of the Buick. Pennie had pleaded guilty to the offense of attempted murder. During the examination of Detective Murillo, King objected to introduction of evidence of Pennie's conviction (bearing the same case number of the case against Lemon and King) of the attempted murder of Officers Torres and Korinek. Defendant King argued that the conviction, which was the result of a plea bargain, did not establish the fact of Pennie's conduct, but merely that he had pleaded guilty. Defendant King further argued the evidence should be excluded under Evidence Code section 352 because the conviction did not relate to King. The court observed that there was a danger the jury would use the conviction as proof of the substantive offense, and amounted to bootstrapping. The court excluded the evidence.

However, because the jury had already heard evidence of Pennie's conviction of attempted murder of a police officer in this case, King and Lemon moved for a mistrial. The court stated that nothing more happened than the marking of the exhibit (Pennie's conviction) and observed that it did not believe the jury was paying attention to case numbers. When the jury returned, the court remarked that it had sustained an objection to the exhibit that had been marked before the break, and admonished the jury not to consider the exhibit for any purpose.

21

### B.    Discussion

The trial court should grant a mistrial "only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Bolden* (2002) 29 Cal.4th 515, 555; accord, *People v. Gonzalez and Soliz* (2011) 52 Cal.4th 254, 291 ["we have stated that a trial court should grant a mistrial only if the defendant will suffer prejudice that is incurable by admonition or instruction"].)  We review the trial court's ruling denying a mistrial for abuse of discretion.  (*Bolden*, at p. 555; *People v. Ayala* (2000) 23 Cal.4th 225, 282.)

Evidence regarding the guilty plea or conviction of a coparticipant in a crime is not admissible to prove guilt of a defendant.  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1322.)  The rationale is that a guilty plea or conviction of a participant is irrelevant to whether another person was positively and correctly identified as a co-participant, and merely invites the inference of guilt by association.  (*Ibid*.)

Here, however, the prosecution's attempt to introduce the conviction of codefendant Pennie was followed by a detailed admonitions to the jury not to consider any exhibits that had not been admitted, which offset the minimal effect of Pennie's conviction.  "[W]e . . . presume, as always, that the jury followed the court's instructions. (*People v. Gonzalez*, *supra*, 52 Cal.4th at p. 292; see, generally *People v. Waidla* (2000) 22 Cal.4th 690, 725 [jury presumed to follow court's instructions and admonitions].)

## V.    Improper Imposition of Separate Punishment for Illegal Possession of a Firearm

Lemon asserts that the trial court improperly imposed separate sentences on his conviction of being a felon in possession of a firearm and his murder conviction. However, because defendant Lemon only possessed the guns for the purpose of the murder, punishment for both the murder and the firearm possession was prohibited by section 654.

A defendant may be convicted of, but not punished for, more than one crime arising out of the same course of conduct.  (§§ 654, 954.)  Section 654 provides that "[a]n

act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." In sum, section 654 prohibits punishment for two crimes arising from a single, indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

Thus, if all of the crimes committed were merely incidental to or were the means of accomplishing or facilitating a single objective, the defendant may receive only one punishment. (*People v. Latimer*, *supra*, 5 Cal.4th at p. 1208.) However, if the defendant had several, independent criminal objectives, he or she may be punished for each crime that was committed in pursuit of separate objectives, even where the crimes shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]" (*People v. Adams* (1982) 137 Cal.App.3d 346, 355; *Harrison*, at p. 335 [question of whether the defendant harbored a "single intent" is a factual determination made by the trial court].) On appeal we will sustain the court's implied factual determination if supported by substantial evidence. (See *People v. Osband* (1996) 13 Cal.4th 622, 730.)

In *People v. Jones* (2002) 103 Cal.App.4th 1139, the court explained the operation of section 654 on the offense of a felon being in possession of a firearm and the crime of murder. ""Whether a violation of section 12021, forbidding persons convicted of felonies from possessing firearms concealable upon the person, constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each individual case. Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has

23

been held to be improper where it is the lesser offense."'" (*Id.* at p. 1143.) Multiple punishment is improper where the evidence "demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense . . . ." (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1412.)

In *People v. Bradford* (1976) 17 Cal.3d 8, the defendant was stopped by a highway patrol officer for speeding. He wrested away the officer's revolver and shot at the officer with it. (*Id.* at p. 13) The California Supreme Court found punishment for both assault with a deadly weapon upon a peace officer and possession of a firearm by an ex-felon was prohibited by section 654 because the defendant's possession of the officer's revolver was not antecedent and separate from the use of the revolver in assaulting the officer. (*Id.* at pp. 22–23.) On the other hand, it is clear that multiple punishment is proper where the evidence shows that the defendant possessed the firearm before the crime, with an independent intent. In *People v. Killman* (1975) 51 Cal.App.3d 951, the defendant had given his girlfriend money to purchase a gun. Several months before the robbery, the defendant used the gun for target practice, and took it with him when he moved to a new residence. (*Id.* at p. 955.) Section 654 did not bar punishment on both first degree robbery and firearm possession charges; the defendant was properly punished "for his own personal possession of the gun before the robbery." (*Killman*, at p. 959.)

In *People v. Ratcliff*, *supra*, 223 Cal.App.3d 1401, the defendant used a handgun to commit two robberies approximately one hour and one half apart. When he was arrested approximately one-half hour later, the handgun was still in his possession. *Ratcliff* rejected the argument that section 654 precluded punishment for both an ex-felon in possession of a firearm conviction and a firearm use enhancement. (*Id.* at pp. 1407–1408.) The court first turned to the "important policy consideration" underlying section 12021, and distinguished violation of section 12021 from other weapons charges, noting that nonfelons could be charged with other firearms violations, but not with violation of section 12021. *Ratcliff* observed that an ex-felon was prohibited from carrying a firearm even if pardoned or granted a certificate of rehabilitation, if his or her prior felony

24

involved the use of a dangerous weapon. (*Id*. at pp. 1409–1410.) These considerations underscored Ratcliff's conclusion that a conviction for firearm possession by a felon represents "a unique circumstance in the minefield of section 654 cases in that this charge involves an important policy consideration." (*Id*. at p. 1409.) *Ratcliff* concluded that the Legislature clearly intended, in enacting section 12021, to minimize the danger to public safety arising from free access to firearms, a danger presumed to be greater when the person possessing the concealable firearm is an ex-felon. (*Id*. at p. 1409.) Ratcliff explained, "Commission of a crime under section 12021 is complete once the intent to possess is perfected by possession. What the ex-felon does with the weapon later is another separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed weapon. [Citations.] In other words, in the case here, defendant's intent to possess the weapon did not import or include the intent to commit the robberies." (*Id*. at p. 1414.)

The record here supports the trial court's implied finding that Lemon possessed the Beretta before the shooting of Arevalo. Both defendants admitted possession of the guns prior to the Arevalo shooting in their conversations with the jailhouse informant; King had seen Arevalo and went to get Lemon. They arrived on the scene with their weapons, indicating they possessed them before the shooting. This evidence was sufficient to support the inference that Lemon's possession of the firearm was antecedent to and separate from the primary offense of shooting Arevalo, making section 654 inapplicable to Lemon's convictions on counts 1 and 3.

25

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.